## WESTERN ELECTRIC CO. v. STANDARD ELECTRIC CO.

### (Circuit Court, N. D. Illinois, N. D. March 8, 1897.

PATENTS—LIMITATION BY PRIOR ART—INFRINGEMENT—DYNAMO-ELECTRIC MA-
CHINES.

The Scribner & Warner patent, No. 496,449, construed in connection with
the prior art, and *held* not infringed as to claim 2, which is for a dynamo-
electric machine having pole pieces perforated on a line coincident with a
plane passing through the axis of the armature shaft, whereby a uniform
magnetic field is produced, regardless of the direction of rotation of the
armature.

Barton & Brown, for complainant.

Francis W. Parker, for defendant.

SHOWALTER, Circuit Judge. This is a bill in equity for the
alleged infringement of letters patent of the United States No. 496,-
449, issued May 2, 1893, on the application of Charles E. Scribner
and Ernest P. Warner, to the complainant corporation as assignee.
The applicants say in the specification that they "have invented a
certain new and useful improvement in perforated pole pieces for
dynamo-electric machines." The proposed monopoly is set forth in
two claims. The action here is grounded on the second of these
claims, which is in words following:

"A dynamo-electric machine having consequent pole pieces cut away or per-
forated on a line coincident with a plane passing through the axis of the arma-
ture shaft, such perforations being symmetrical with regard to said plane,
whereby a uniform magnetic field is produced, regardless of the direction of the
rotation of the armature, substantially as described."

The first claim of this patent is for the method set forth more at
large in the specification, whereby the exact size of the cuttings or
perforations (that is to say, the ultimate shape of the pole pieces) is
attained. As I understand from the patent and from the testimony,
a dynamo-electric machine is first constructed with consequent and
uncut pole pieces. The predetermined resistance or full load is
let into the external circuit. The armature is then rotated at the
predetermined speed, and the predetermined current is generated or
induced in the external circuit. The brushes, under these conditions,
are put in position for maximum and sparkless commutation by ex-
perimental readjustment of the field coils. As I understand from
the evidence, the point of maximum commutation is at this stage
forward not only of the point of maximum electro-motive force, but
forward of what will be the point of practical and maximum commuta-
tion when the cuttings or perforations in the pole pieces shall have
been completed on the method of the patent. The brushes are there-
upon shifted forward from point to point through the quadrant of
commutation as the machine is operated, the load or resistance in the
circuit being at the same time proportionately cut down. At each
successive position of the brushes it will ordinarily be found that,
when the current is preserved constant, sparking will appear, and
that the movement of the brushes in that locality to bring them to
the point of sparkless commutation reduces or changes the current

in volume. These variations in current and in the position of the brushes are noted as the exploration proceeds throughout the quadrant of commutation, and from them as a guide the cuttings or perforations of the pole pieces are finally, and after successive trials, completed. The specification contains the following statement:

"Our invention consists in producing in the field lines of force uniformly distributed as to generating or current producing effect throughout the arc or segment traversed by the coils of the armature opposite the faces of the different pole pieces, whereby the machine is made capable of running in either direction, and of being regulated under varying load to maintain constant current strength by shifting the brushes upon the commutator."

At the moment the short circuit is completed in the quadrant of commutation, the current from the working circuit with which the coil then parts is still running in such coil. This current is at once dissipated, and another in the contrary direction is induced. If this latter current be brought up to the point where it has the same volume and momentum as the working circuit which it is about to join, and if this condition be attained at the instant the coil becomes part of said working circuit, there will be neither flash nor spark. But the electrical state of the short-circuited coil is the resultant of shifting conditions. With respect to magnetic saturation, the state of the armature core varies from the region of the pole tips to the center of the pole pieces, and the poles of the armature, considered as a magnet, change in position as the brushes are moved. The uniformity of field sought by the method of the patent in suit is a uniformity in resultant effect on the short-circuited coil, to the end that, at whatever position in the quadrant of commutation the short-circuiting may occur, the current shall at the instant the short circuit is broken be the same in volume and momentum as that of the working circuit which it then joins. The cutting or perforation of the claim in suit is functional, on the theory of the patent, to secure (1) a current greater in volume than would be practical without cutting or perforation; (2) a current which is constant and uniform in volume under all variations of load; (3) sparkless commutation; and, (4) as I infer from the evidence and specification of the patent, wider range of the brushes; that is, greater variation in electro-motive force, or greater variation in load or working capacity. Prior to this patent the difficulty of sparks or flashes at the commutator was met —or the effect of sparks or flashes avoided—by brushes adjusted for variable overlap, by a construction whereby the segmental subdivisions of the commutator were greatly increased in number, or by a provision for blowing out the sparks. As I gather from the testimony, there are from 10 or 12 to 16 or 18 commutator segments in the machine made by complainant, and the brushes used in connection with such machine have a fixed overlap. The dynamo-electric machine constructed by defendant at the time this suit was brought was a consequent pole machine, with 96 segments on the commutator. Each pole piece contained a cut or perforation in the center, on a line coincident with a plane through the axis of the armature, and symmetrical with reference to said plane. The pole pieces were not, however, shaped or cut pursuant to the method of the patent;

81 F.—13

nor,. apparently, were said pole pieces, especially if the base or bed plate is to be considered, quite uniform in shape or volume of magnetic material, or symmetrical with respect to each other. The effect of the cutting in the case of the machine as made by defendant was intended to be, and in fact was, to increase the volume or quantity of the current. A machine which, for instance, without the perforation, would yield a current of seven amperes, became, with the perforation, an eight-ampere machine. With the pole pieces uncut, the current would decrease from no load to full load. When perforated, the tendency of the current was to increase in volume from no load to full load. But in defendant's machine the cuts or perforations in the pole pieces did not enlarge the working range or variation in electro-motive force, nor were they the means of securing sparkless commutation. So much I gather more particularly from the testimony of Clinton E. Woods, a practical electrician, called by both the parties as a witness. The iron ring or core of the revolving armature is itself, as before suggested, a magnet. I gather from the testimony and the arguments that, when the machine is in operation, there results out of the condition of the armature a magnetic flow or current from the neighborhood of the forward tip of the pole piece along the adjacent armature core to the rear pole tip; thence across the gap space; thence along the pole piece back to the forward tip; thence across the gap space to the armature core. The lines of force due to the field magnets, and which enter the armature core, crossing the gap space from the center of the pole piece to the forward tip, and so proceeding by the armature core to the opposite pole of the field magnets, are, within the space along the armature core from the forward tip to the center of the pole piece, antagonized by the magnetic flow in the armature core already spoken of. There results from this antagonism what is called the "distortion of the field due to armature reaction." The field of force is thus narrowed and weakened, especially near the pole tip, or the place of maximum commutation. The cutting or perforation in the pole piece interposes an additional resistance to that current, which is due to the magnetic condition of the armature; thus strengthening the field, and shifting it in the direction of maximum, and from the point of minimum, commutation. In this way the quantity or volume of the current in the external circuit, but not necessarily the working range of the machine, is increased. Counsel for complainant say in their argument, in reply:

"It will be seen that the perforation or slot in the pole piece obstructs or throttles the magnetic flux, or increases the magnetic reluctance; and therefore it destroys, to a certain etxent, the effect of the magnetism of the armature core. Now, the effect of the magnetism of the armature core is to neutralize the effect of the field magnet, and this neutralizing effect takes place at the tip of the pole piece [meaning the forward tip]. The result of this neutralizing or demagnetizing effect of the armature core magnet is to cause the magnetic flux in the vicinity of the tip of the pole piece [meaning the forward tip] to be much weaker than it should be. So the cutting of the slot in the pole pieces, which destroys the effect of the magnetism of the armature core to a certain extent, by increasing the resistance of the magnetic circuit from one pole to the other of the armature core, has the double effect of weakening the field magnet at the point where the field magnet tends to concentrate the lines of

force, and also to remove the antagonistic effect of the magnetism of the armature core at the pole tip [meaning the forward tip]."

They say, further, in explaining the operation of the complainant's machine (and this is also in their reply argument):

"In the operation of a dynamo, the armature lines of force flowing through the pole pieces, being of the same polarity as and opposite in direction to the lines of force flowing from the pole pieces through the armature, will repel the field of force lines, and force them in the direction of rotation of the armature. This is called the 'distortion of the field of force due to armature reaction.' The effect of the distortion of the field of force is to concentrate the lines of force at the middle or central portion of the pole pieces, and to materially diminish and weaken the lines of force at the forward tips of the pole piece, and by this we mean at the tip where the short-circuited coil enters when the brushes are adjusted for full load."

The specification of the Hochhausen patent, No. 404,848, dated June 4, 1889, contains the following statements:

"The object of my invention is to * * * heighten the efficiency of dynamo-electric machines. My invention also relates to the construction of the field-of-force magnet for dynamo-electric machines and motors, and, in some of its features, relates more especially to machines of the kind in which the field magnet is composed of two or more electro-magnets having their like poles conjoined to form a magnetic field-of-force pole [that is, to consequent pole machines]."

I quote further from the Hochhausen specification:

"In machines of this construction, it is common to use as the pole a mass of iron joining the ends of the magnets, and curved to form a proper pole face for the armature rotating in proximity to it. Owing to a reaction between this mass of iron and the armature of the machine, the line of strongest magnetization and the line of commutation are in ordinary machines shifted to a greater or less extent forward in the direction of rotation when the machine is in operation. With field-of-force magnets, as ordinarily constructed, I have found that there is not, strictly speaking, a symmetrical magnetic field, and the brushes of the machine cannot be set exactly on a diametrical line. My invention consists of a field magnet having a perfectly symmetrical field produced in obvious manner: that is to say, by a symmetrical disposition of the masses of iron making up the field magnet or the framework with relation to the field-of-force poles. Pieces or blocks of diamagnetic material—such as brass, and indicated at F—serve to mechanically unite the juxtaposed pole ends without furnishing any mass of magnetic material, which, as before explained, might give rise to a distortion of the magnetic field during rotation of the armature. The form of magnet shown and described gives great compactness, and at the same time a highly-intense magnetic field for the armature is obtained. It will be seen that, from the construction just described, there is practically no mass of iron forming a pole piece for the machine that is not under the strong and direct influence of field-of-force coils; and it results, therefore, that, owing to the absence of the usual mass of magnetic material removed from the coils, but employed to join the pole ends of the electro-magnets, the armature is less able to shift the line of strongest magnetism in the direction of rotation."

The slot or space in the center of the pole pieces is also emphasized by Hochhausen in his second, third, and fifth claims, which are as follows:

"(2) In a dynamo-electric machine or motor, a field-of-force magnet consisting of two electro-magnets, whose cores are curved in the arc of a circle which, prolonged, would pass through the center of the armature, and which magnets have their core ends of the same name magnetically distinct, so far as concerns union by a mass of nonmagnetic material, but held in proper proximity and properly formed to constitute together a field-of-force pole piece. (3) In a dynamo-electric machine or motor, a field-of-force pole piece consisting of two magnet-

core ends of the same polarity, arranged in proximity, with the axes of the magnet cores at the end presented to the armature, forming substantially a perpendicular to the circle of the armature periphery, in combination with uniting pieces of nonmagnetic material, as and for the purpose described." "(5) In a dynamo-electric machine or motor, a field-of-force magnet composed of two electro-magnets whose like poles are placed in proximity, but are magnetically disunited, in combination with the uniting diamagnetic block, and whose magnetic axis continued from their pole ends would cut the circular periphery of the armature at a right angle."

It is said that the Hochhausen machine has no pole pieces, and is thereby distinguished from the invention of the patent in suit. Pole pieces are merely extensions of the magnet cores beyond the coils in order to form the concave or cylindrical space between the opposite poles in which the armature may revolve. The windings in the Hochhausen machine are brought far towards the ends of the cores, and over the pole pieces. In that machine the pole pieces may be said to be rudimentary or initial, but they are there, and they are consequent pole pieces. If the ends were brought in contact; if the cut, which in that machine is on a line coincident with a plane through the armature axis, and symmetrical with reference to said plane, were not made; if the interposed strip were not nonmagnetic,—the distortion of the field due to armature reaction would be present in that machine. The slot filled with the nonmagnetic material has distinctly the function of abating the armature reaction, as against the lines of force between the field magnets, by interposing a resistance to the magnetic current in the armature core, and so of strengthening the field near the forward pole tips. So far as I can find, there is not in the Hochhausen patent, or in any prior patent wherein slotted or perforated consequent pole pieces are shown, any suggestion that the slot or perforation is so made as to secure sparkless commutation, constant current, or wider variation in the range of the brushes. But, as said, strengthening the field by abating armature reaction, and so increasing the volume of the current, is the distinct purpose of the slot in the Hochhausen machine; and this, as also noted above, is the function of the slot in the machine made by defendant when the suit was brought. In the machine as subsequently made by defendant, the pole pieces are not perforated, nor are they cut out eccentrically, as described in complainant's patent. Moreover, the number of commutator segments is increased in the new machine from 96 to 132. It is not stated in the claim that the opposite poles are uniform in volume, or symmetrical in construction, with respect to each other. But the diagrams seem to show that they are so made, and, from the requirement that the armature is to be rotated in either direction, it might be plausibly concluded that the opposite poles must present to each other faces of the same dimensions, and must be symmetrical in volume of magnetic material. On this ground, perhaps, the machine of defendant is also distinguished from that of complainant. However, for reasons before given, and on what seems to me the best conclusion from the evidence, I think the claim is so far limited by the prior art that the defendant does not infringe. The bill is therefore dismissed for want of equity.